**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **GUARDIAN MEDIA** | § | |
| **TECHNOLOGIES, LTD.,** | § | |
| | § | |
| **v.** | § | **CASE NO. 6:10-CV-597** |
| | § | |
| **ACER AMERICA CORP., et al.,** | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This Memorandum Opinion construes the terms in United States Patents No. 4,930,158

("the '158 Patent") and 4,930,160 ("the '160 Patent") (collectively, the "patents-in-suit").

Further, after reviewing the briefing and arguments relating to Defendants' Amended Motion for

Partial Summary Judgment of Invalidity of Claim 21 of U.S. Patent No. 4,930,158 (Doc. No.

586), the Motion is **DENIED.**

## BACKGROUND

On November 10, 2010, Guardian Media Technologies, Ltd. ("Guardian") filed a

complaint alleging that AT&T Operations, Inc., and thirty five other parties infringed the

patents-in-suit, which generally relate to methods and systems for censoring video programs.

Doc. No. 1.[1]  These patents have an extensive history, having been already construed several

times and undergone a reexamination.[2]  *See Guardian Media Techs., Ltd. v. Coby Elecs. Corp.*,

---

[1] At the time of the Markman hearing, AT&T Operations, Inc., Microsoft Corporation, Gamestop Corporation, Conn's Inc., Microcenter Sales Corporation, Haier America Trading, L.L.C., Imation Corp., Memorex Products, Inc., J & R Electronics Inc., Motorola Mobility LLC, Office Depot, Inc., Rent-A-Center, Inc., Staples, Inc., TTE Technology, Inc. and Verizon Online, LLC remained as defendants.

[2] Only claims 8–11 and 19–22 of the '158 patent and claims 3, 6, 7, 16, 19 and 20 of the '160 Patent survived the reexamination proceedings.

No. 2:08-CV-8439, 2009 WL 1615981 (C.D. Cal. June 8, 2009) (Real, J.) ("*Coby*"); *Guardian Media Techs., Ltd. v. Toshiba Am. Consumer Prods., LLC*, No. 2:09-CV-52, Doc. No. 48 (C.D. Cal. Aug. 21, 2009) (Real, J.) ("*Toshiba*") (attached to Doc. No. 585 as Exhibit I), *vacated*, No. 2:09-CV-52, Doc. No. 65 (C.D. Cal. Oct. 27, 2010); and *Sony Elecs., Inc. v. Guardian Media Techs., Ltd.*, 658 F. Supp. 2d 1208, 1222-23 (S.D. Cal. 2009) (Gonzalez, J.) ("*Sony*"), *vacated*, No. 05-CV-1777, Doc. No. 255 (S.D. Cal. Aug. 24, 2012) (attached to Doc. No. 592 as Exhibit 10).  On January 10, 2013, the Court conducted a *Markman* hearing on the disputed terms of the patents-in-suit.  All disputed terms presented below are found in claims 8–11 and 19–21 of the '158 patent and claims 3, 6, 7, 16, 19 and 20 of the '160 Patent.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323.

3

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The patents-in-suit also contain means-plus-function limitations that require construction. Where a claim limitation is expressed in means-plus-function language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112 ¶ 6. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112 ¶ 6 "mandates that such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (quoting 35 U.S.C. § 112 ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must turn to the

written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves multiple inquiries. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "[t]he next step is to determine the corresponding structure described in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Braun*, 124 F.3d at 1424.

Defendants also contend that one claim at issue is invalid for indefiniteness. A claim is invalid under 35 U.S.C. § 112 ¶ 2 if it fails to particularly point out and distinctly claim the subject matter that the applicant regards as the invention. The party seeking to invalidate a claim under 35 U.S.C. § 112 ¶ 2 as indefinite must show by clear and convincing evidence that one skilled in the art would not understand the scope of the claim when read in light of the specification. *Intellectual Prop. Dev., Inc. v. UA–Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003).

## CLAIM TERMS

Prior to the *Markman* hearing, the parties agreed upon the following constructions:

- "comparing the detected code" means "comparing a detected program classification code";

- "alternative" means "another; different"; and

- "means for accessing said memory and comparing the contents thereof with received codes" is a means-plus-function limitation, wherein the function is "accessing said memory and comparing the contents thereof with received codes" and its structure is "microcomputer programmed to perform the 'Read Classification,' 'Generate array address,' and 'test array bit' steps shown in Figure 2."

## CONSTRUCTION OF DISPUTED TERMS — U.S. PATENT NO. 4,930,158

**auxiliary device**

Guardian proposes "a device that provides a supplementary function."  Defendants submit two proposals, one from AT&T and Haier ("the AT&T Defendants") and one from the other defendants ("the non-AT&T/Haier Defendants").[3]   The non–AT&T/Haier Defendants propose "the source of substitute video material, where such material may include messages, information, advertisements or other video programs," whereas AT&T and Haier propose "a playback device, such as another VCR, that is physically separate from the video player that plays back the video program, and is the source of substitute program material."

The primary dispute between the parties is whether the term includes "substitute program material."  Guardian contends the term does not, arguing claim differentiation.  Guardian argues

---

[3] The non-AT&T/Haier defendants are: Microsoft Corporation, Gamestop Corporation, Conn's Inc., Microcenter Sales Corporation, Imation Corp., Memorex Products, Inc., J & R Electronics Inc., Motorola Mobility LLC, Office Depot, Inc., Rent-A-Center, Inc., Staples, Inc., TTE Technology, Inc. and Verizon Online, LLC.

for example independent claim 19 only requires a video program to be suspended, while dependent claim 21 requires "substitute program material."  Doc. No. 583 at 2–3.  Therefore, Guardian argues it would be improper to read a dependent limitation into independent claims. Doc. No. 592 at 7.

The non-AT&T/Haier Defendants propose the construction found by the Southern District of California in *Sony*.  658 F. Supp. 2d 1208, 1222-23 (S.D. Cal. 2009).  These defendants argue this Court should adopt that construction, because the intrinsic evidence supports it and Guardian itself has previously construed "auxiliary device" to include substitute source of video material.  Doc. No. 585 at 22–24; *Sony*, 658 F. Supp. 2d at 1218–19.  At the *Markman* hearing, counsel for the non-AT&T/Haier Defendants clarified that the *Sony* case should only be considered as persuasive authority; the non-AT&T/Haier Defendants were not arguing judicial estoppel.

The AT&T Defendants propose a slightly different construction than the non-AT&T/Haier Defendants.  AT&T and Haier argue that the term should be defined as a video source that is physically separate from the video player, because that is how it is defined in the specification. Doc. No. 585 at 23. This definition is also consistent with statements made by Guardian during the reexamination.  *Id.* at 24.  Additionally, AT&T and Haier argue that Guardian's proposal should be rejected, because the word "supplementary" is vague and lacks support in the specification.  *Id.*

Reviewing the intrinsic evidence, it is clear that an "auxiliary device" is a source of substitute programming.  An "auxiliary device" cannot simply be any "supplementary" device, as Guardian proposes, otherwise, the term would be so broad as to cover almost any conceivable device.  Such an all-encompassing reading would be disfavored.  *See Retractable Techs., Inc. v.*

*Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) ("In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention.") Although the disputed term, "auxiliary device," is generic on its face, the term must be read "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.  Throughout the specification, "auxiliary device" is described as playing substitute material.  '158 Patent col. 5:26–31, 5:38-41, 5:48–55. For example, when it receives a particular code, it "responds by playing another recording." *Id.* col. 5:26–31, 5:38–41, 5:48–55.  Guardian contends that this construction would improperly import dependent limitations into independent claims; however, the actual dependent limitation cited by Guardian refers to playing the substitute material until the resumption signal is received, *not* that the auxiliary device plays the material. *Compare id.* col. 8:53–8:68, *and id.* col. 9:7–col. 10:3. *See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Claim differentiation, while often argued to be controlling when it does not apply, is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and *that limitation is the only meaningful difference between the two claims*.") (emphasis added).

As to what the substitute material could be, the substitute material "may include messages, information, advertisements or other video programs," however, it is unnecessary to include specific examples of the material in the construction itself. *See* '158 Patent col. 5:45–55. The AT&T Defendants propose, in addition to substitute program material, that the auxiliary device must be physically separate from the video player.  AT&T and Haier cite to a disclosure

8

in the specification of "an auxiliary device, *such as another VCR*" to argue the device must be separate, however, the use of "such as" does not necessarily require another VCR. *See* '158 Patent at 5:26-31 (emphasis AT&T and Haier's). Additionally, the AT&T Defendants cite to statements made during the reexamination to support their proposal, but these statements were made by the PTO, not the patentee. Doc. No. 585 at 24 (quoting Ex. Z, 12/13/2005 Order Granting Reexamination at 6-7). AT&T and Haier have failed to demonstrate why statements made by the PTO should be binding upon the patentee or that the PTO maintained this position throughout the reexamination proceedings. Therefore, it would be improper to limit the term "auxiliary device" to being separate from the video player, as the AT&T Defendants suggest.

The parties also dispute whether the auxiliary device must necessarily play substitute material or could instead be associated with merely suspending playback of the main program. Although "auxiliary device" is a source of substitute program material, the term "auxiliary device" does not itself require that substitute program material is actually played. Depending on the claim language, the auxiliary device may be used when a main program is only suspended. *See, e.g.,* '158 Patent claim 19. That is, the auxiliary device need not actually play substitute program material unless such a requirement is set forth by other claim language. *See, e.g., id.* claim 21.

Accordingly, the Court construes "auxiliary device" to mean "source of substitute program material."

**"set of selected codes"**

Guardian proposes "one or more user selected codes," while Defendants propose "more than one code, each of which has been assigned a value by the user."

The major argument between the parties is whether the use of "set" requires more than one code.   Guardian argues a "set" may only have one member, because a user could theoretically select only one classification when programming the classifications.  Doc. No. 583 at 4–5 (citing '158 Patent col. 4:1–8).   In Guardian's opinion, nothing in the intrinsic record precludes this possibility.  *Id.* at 6.  Defendants counter that the embodiment cited by Guardian "states that a test is performed to see whether the whole array has been programmed after each classification group number is set, not that the test can be performed only once for a single selected code."  Doc. No. 585 at 14.  Defendants argue that the intrinsic record instead supports their proposal.  For example, the specification defines the contents of the set as codes, indicating a set includes more than one code.  *Id.* at 13.   Additionally, Defendants argue that because the claims recite "selected codes," a choice between at least two codes must be made.  *Id.* at 15.

Defendants also cite the reexamination prosecution history, in which the patentee and the examiner purportedly stated the term requires multiple codes.  *Id.* at 14.  Lastly, Defendants urge the Court to adopt their construction, in light of the Southern District of California's decision to adopt to the same construction in the *Sony* case.  *Id.* (citing 658 F. Supp. 2d 1208, 1222-23 (S.D. Cal. 2009)).

In *Sony*, the Southern District of California construed "comparing the detected code to a set of selected codes" to mean "comparing a detected program classification code to more than one code, each of which has been assigned a value by the user."[4]  *Id.* at 1223.  The parties in *Sony* had agreed upon the construction for "comparing the detected code," so the only dispute concerned the meaning of "a set of selected codes."  *Id.* at 1222.  With respect to "a set of

---

[4] The *Sony* court later vacated its claim construction upon joint motion of the parties.  *See* No. 05-CV-1777, Doc. No. 255 (S.D. Cal. Aug. 24, 2012) (attached to Doc. No. 592 as Exhibit 10).

selected codes," the *Sony* court found "[r]egardless of how the Court defines the word 'set,' the Court's interpretation of the word 'codes' is dispositive." *Id.* Since the claim language and the specification used the plural "codes" and not the singular "code," this indicated that the patentee intended the contents of the set to be multiple codes. *Id.* In the absence of any compelling evidence from Guardian to the contrary, the *Sony* court construed "a set" to be more than one code. *Id.* at 1223.

When this Court considers a prior construction, it considers that parties may raise different arguments and may highlight different evidence. In the *Sony* case, Guardian relied solely on the dictionary definition of the term "set" and prior unrelated cases wherein the term "set" was found to have the plain meaning of "one or more." *Id.* at 1221. Here, Guardian argues that the intrinsic record supports its construction. The Court therefore turns to an analysis of the evidence and arguments presented in the parties' briefing and at the *Markman* hearing.

The specification explains that classification codes can be programmed to prevent playback of certain material, for example if the video is violent, sexually explicit, or adult only. '158 Patent col. 3:62–4:22. However, the specification does not preclude having only one classification code which prevents playback of material. *See* '158 Patent col. 4:6–10, Figure 3. ("A test is then performed to see whether the whole array has been programed. If it has, control is returned to the operational loop, if not, the next array element is addressed, and the input cycle repeated for the next classification code."). If the "whole array" included only one code, for example, a code for violence, then after the "first bit of the code array" is "cleared" or "set," then the test "to see whether the whole array has been programmed" would determine that the code programming process has been completed. *See id*. Defendants argue though that the claim language itself precludes this interpretation. Doc. No. 585 at 14 (citing *Johnson & Johnston*

*Associates, Inc. v. R.E. Service Co.*, 85 F.3d 1046, 1055 (Fed. Cir. 2002) (en banc) (finding claims did not encompass steel sheets, because the claims only recited aluminum, even though the specification disclosed other materials)). *Johnson & Johnston* is inapplicable here, however, because the constituent term "set" can encompass one or more, as discussed above.

Defendants also argue that statements made during reexamination support their proposed construction.  Defendants are correct — the patentee and the PTO did refer to the possibility of using more than one code in a set.  Doc. No. 585, Ex. O, 7/28/2006 Supplemental Response to Office Action at 5 ("The '158 patent contemplates that there will be more than one classification code available to set, such as ratings X, R, PG, PG-13, G, etc."); Ex. P, 2/8/2008 Office Action at 3-5 (". . . a comparison of a detected code to classification codes . . . .").  But Defendants have failed to identify any "definitive statements" by the patentee requiring that a "set" of codes must comprise multiple codes.  *Omega Eng. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution.") (emphasis added).

Finally, Defendants have failed to establish, at least in the case of multiple codes, that each and every code must be assigned a value manually by the user.  Defendants have failed to demonstrate that the specification precludes setting codes in batches or according to some pre-defined rules.  For example, the codes could be assigned in a system where setting the value of one code (such as for "PG-rated" movies) affects the values of other codes (such as for "R-rated" movies and above), as Guardian has suggested.

Accordingly, the Court construes "set of selected codes" to mean "one or more user selected codes."

**"detecting a code within the signal"**

Guardian contends that no construction is necessary.  Defendants propose "detecting a code embedded in the signal."   At the *Markman* hearing, the parties agreed to adopt Defendants' proposal, so long as it was clear that "embedded in" did not require the code to be embedded in any particular part of the signal.   *Markman* Hr'g Tr. 74:4–20, Jan. 10, 2013.  Thus, to whatever extent Defendants maintain that the code must be embedded within, for example, the *video* portion (or video-related portion) of the program signal, Defendants' proposal is expressly rejected.

Accordingly, the Court construes "detecting a code within the signal" to mean "detecting a code embedded in the signal."

**"playing / replay"**

The parties now agree that "playing" and "replay" mean "processing of the video program to produce video signals of a form suitable for display."  Doc. No. 583 at 7.

**"suspended / to be suspended"**

Guardian proposes "holding, pausing, temporarily stopping, or deferring until a predetermined time period or type of action."  Defendants contend no construction is required.

Guardian argues this term should be construed to avoid potential confusion.  Guardian raises concerns that "suspended" may be interpreted to require that a video program start playing before it can be suspended.  Therefore, Guardian suggests adopting a modified version of the PTO's definition of "suspending": "a holding, pausing, temporarily stopping or deferring until a predetermined time period [or] type of action, i.e., the video program is present but is not continuing to replay because it is temporarily stopped or held."  Doc. No. 583 at 8 (quoting Ex. 3, 7/23/2008 Notice of Intent to Issue Ex Parte Reexamination Certificate at 7).

13

Defendants counter that the disputed terms "are within the common knowledge of a lay person" and require no construction.   Doc. No. 585 at 16.   Defendants further contend Guardian's proposal does not clarify the term but rather creates confusion. *Id.* at 17.  If the Court does find the term requires construction, Defendants argue the term should be construed to require that a video program is first played before it is suspended. *Id.* at 17–19.  Defendants argue that the recital of "resuming replay" in the claims, the disclosure in the specification of "suspending" after playing has begun, and the reexamination prosecution history in which the patentee and the examiner both acknowledged that "suspended" in the claims require that the video program must first be playing. *Id.* at 17-19.   In response, Guardian argues Defendants have misconstrued the statements made by the Examiner during the reexamination, and their proposal is in fact contrary to the reexamination prosecution history.  Doc. No. 592 at 5–6.

While not every term requires construction, here the parties have a dispute regarding the scope of the claim, i.e. whether the term encompasses holding or deferring the program before the program begins. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute.")

During the reexamination, both Guardian and the PTO made statements regarding the claim scope.  Because the patent expired during the reexamination, the patentee and the PTO construed the claims according to the principles set forth in *Phillips*, rather than applying the broadest reasonable construction, as the PTO normally does.  Doc. No. 585, Ex. R, 7/23/2008 Notice of Intent to Issue Ex Parte Reexamination Certificate at 3.  During the reexamination, Guardian distinguished certain prior art references by arguing they failed to disclose first playing

the video then suspending it, noting that the claim element "causing playing of the video to be suspended" "requires, even if only briefly, that the video program be first playing in order to be subsequently suspended."  Doc. No. 585, Ex. Q, 6/9/2008 Response to Advisory Action at 11-12 (emphasis added).   While PTO disagreed with Guardian's exact claim interpretation, it confirmed that "suspending" means "pausing," stating that "suspending" is interpreted as a "holding, pausing, temporarily stopping or deferring until a predetermined time period type of action, i.e. the video program is present but is not continuing to replay because it is temporarily stopped or held."  *Id.* at 7 (emphasis added).

Here, the patentee made "definitive statements" regarding the meaning of "suspended" during the reexamination proceedings, and these statements should be given effect during claim construction.  *Omega Eng.*, 334 F.3d at 1324; *cf. Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("The patentee is bound by representations made and actions that were taken in order to obtain the patent.").   Additionally, the PTO's interpretation under *Phillips* provides guidance on how the patentee's statements during reexamination should be applied.  Although the reexamination occurred after the original prosecution, patent examiners are "assumed . . . to be familiar from their work with the level of skill in the art."  *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984); *see St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.*, 412 F. App'x 270, 276 (Fed. Cir. 2011) ("Because an examiner in reexamination can be considered one of ordinary skill in the art, his construction of the asserted claims carries significant weight.").   In this case, the PTO statement relied upon by Guardian notes that "the video program is present but is not *continuing* to replay because it is temporarily stopped or held."  Doc. No. 583, Ex. 3, 7/23/2008 Notice of Intent to Issue Ex Parte Reexamination Certificate at 7 (emphasis added).

Accordingly, the Court construes "suspended" to mean "active playback is paused or temporarily stopped until a predetermined time period or type of action."[5]

**"substitute program material"**

Guardian proposes "alternative program material, such as messages, information, advertisements or other video programs."  Defendants propose "video material that replaces a portion of a video program."

Guardian argues that Defendants' proposal improperly requires a video to completely replace the blocked video program.  Doc. No. 583 at 9.  Guardian contends that once substitute program material is played, it is possible for the original video program to start playing at exactly the point at which it was suspended.   Doc. No. 592 at 7.   Defendants counter that the specification discloses the substitute material actually replaced the original video program, therefore the Court should adopt their proposal.  Doc. No. 585 at 21.  Defendants also highlight that Guardian has previously admitted in a related case that "the auxiliary device provides substitute video material," thus Guardian should have no issue that the term only includes video material.  *Sony*, 658 F. Supp. 2d 1208, 1219 (S.D. Cal. 2009).

While Guardian contends the Defendants' inclusion of "replace" is improper, Guardian has failed to show how the intrinsic record supports its construction.  The specification discloses that one capability of the invention is "providing means for *replacing* [an] unwanted program with [a] programme from another source."  '158 Patent col. 5:11–14.  Guardian argues that the specification discloses also stopping a video program, which demonstrates how a tape could be

---

[5] To avoid future confusion, the words "held" and "deferred" were omitted from the construction.  Additionally, it should be clear that what is "suspended" is an active playback, i.e., a video that has begun to play.

suspended without substitute material replacing the original video program.  *Id.* col. 6:15–19.

However, this example only discusses stopping the video, not substituting, which requires

replacement.  *See id.* 5:11–14, Fig. 5 ("REPLACE code").   Guardian has not cited any other

disclosures where the video is not replaced, and no such disclosure is apparent in the '158 Patent.

        Regarding Guardian's proposal to include examples of program material in the

construction, there is no dispute among the parties that those are examples of the program

material.  *Markman* Hr'g Tr. 84:9–18.   However to include the list of examples in the

construction would be cumbersome and unnecessary.  But the word "video" should nonetheless

be part of the construction, based on the consistent disclosure of program material as video

material and based on the absence of any disclosure of, for example, audio-only substitute

program material.

        Accordingly, the Court construes "substitute program material" to mean "video material

that replaces a portion of a video program."

### "video program" (Claims 8 & 19)

        Guardian proposes "broadcast television programs, video tapes, cable television, and

other forms of video distribution, regardless of the media on which they are recorded."

Defendants propose "recorded movies, broadcast television programs, and cable television,

regardless of the media on which they are recorded."

        Guardian argues in favor of its construction, submitting that the patentee expressly

defined "video program" in the Australian patent application to which the patents-in-suit claim

priority as "broadcast television programs, video tapes, cable television, and other forms of video

distribution, regardless of the media on which they are recorded."  Doc. No. 583 at 10.  Guardian

also argues that Defendants' proposal would improperly limit the term to just movies or

television.  *Id.*  Guardian urges that "the term 'video program' is broad and should be construed to include all forms of video distribution."  *Id.*

Defendants counter that their proposal is the construction that the Central District of California adopted in *Coby*.  Doc. No. 585 at 19; No. 2:08-CV-8439, 2009 WL 1615981 (C.D. Cal. June 8, 2009) (Real, J.).  Defendants urge that Guardian is collaterally estopped from arguing for a different construction here.  Doc. No. 585 at 19 (citing *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d 320, 323 (5th Cir. 2005)).  In response, Guardian asserts that collateral estoppel does not apply, but even if did, it would only be estopped from arguing that video games are "video programs," because "all that was at issue [in *Coby*] was whether Nintendo Wii video games qualified as video programs."  Doc. No. 592 at 6.

A party is estopped from re-litigating an issue when: (1) the issue at stake in the pending litigation is the same as the issue in the initial litigation; (2) the issue was actually litigated; and (3) determination of the issue in the initial litigation was a necessary part of the judgment. *Microsoft Corp. v. Commonwealth Scientific & Indus. Research Org.*, 572 F. Supp. 2d 786, 801 (E.D. Tex. 2008) (citing *Harvey*, 434 F.3d at 323).  In *Coby*, Nintendo moved for summary judgment of non-infringement, arguing its video games did not meet the video program limitation. 2009 WL 1615981, at *1.  The Central District of California found that "[b]ased on the intrinsic evidence . . . the '158 patent claim limitation 'video program' [] mean[s] 'recorded movies, broadcast television programs, and cable television, regardless of the media on which they are recorded.'" 2009 WL 1615981, at *3.   However, the *Coby* court did not provide any further analysis of the term "video program."  *Id.*

While the *Coby* court addressed whether video games met the claim limitation, Defendants have not established that rejection of all "other forms of video distribution" was a

18

necessary part of the judgment.  The issue in *Coby* was whether video games were within the scope of the term "video program."   Therefore, Guardian is *not* collaterally estopped from proposing a different construction of "video program."   Thus, the primary dispute between the parties is whether the construction should include "other forms of video distribution."

In the Australian provisional application to which the '158 Patent claims priority, the patentee stated that "[t]he present invention relates to methods of, and apparatus for, automatic censorship of video programmes.   The term video programmes used hereinafter refers to broadcast television programmes, video tapes, cable television, and other forms of video distribution.  The term also encompasses the accompanying audio or sound track if any." Doc. No. 583, Ex. 4, 9/2/1987 Australian Provisional Specification at 2. However,  the  phrase  "other forms of video distribution" is vague and potentially overbroad.

Accordingly, the Court construes "video program" to mean "recorded video programs, broadcast television programs, and cable television, regardless of the media on which they are recorded."

**"means for receiving from a video storage medium, signals representative of a video program"**

The parties agree that this term is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6 and agree on the claimed function, "receiving, from a video storage medium, signals representative of a video program."   As to the structure, Guardian proposes "domestic equipment upon which video recordings can be played, including, for example, video tape recordings and video disc recordings."  Defendants propose "Replay Signal Processor 4, which is a conventional component of a video recorder player (VCR)."

Guardian argues that the structure that receives the signals is the video player itself, which can be "any domestic video player, including, for example, both VCRs and video disk players." Doc. No. 583 at 11-12. Defendants respond that while the VCR plays the recording, the actual "structural component that receives the signal from the storage medium is the VCR's 'replay signal processor.'" Doc. No. 585 at 25.

Although the specification discloses that "domestic equipment" can play video tape recordings, that structure is not linked to the agreed-upon function. '158 Patent col. 1:12–13; *see Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1376 (Fed. Cir. 2010) (noting that "the written description must clearly link or associate structure to the claimed function"); *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363 (Fed. Cir. 2012) ("In exchange for the ability to use a generic means expression for a claim limitation, 'the applicant must indicate in the specification what structure constitutes the means.'") (quoting *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 (Fed. Cir. 2007)). Rather, the specification discloses that a VCR can be used to perform the agreed-upon function, explaining that a VCR comprises a "record signal processor 2, replay signal processor 4, transport controller 9 and storage medium 3, which is typically a video cassette, but may also be a video disk or any other suitable storage medium." '158 Patent col. 2:48–53. While the replay signal processor 4 is not discussed anywhere else in the specification, the structure, by virtue of its name and the above-quoted surrounding context, is linked to the receiving function here at issue. Further, Figure 1 illustrates that the replay signal processor 4 is connected to the "storage medium 3" and outputs the "replay signal output 10."

Guardian argues that the structure should not be limited to only the replay signal processor 4, because the specification states that "[t]he invention is also not limited to

application with tape as the recording medium, being equally suited to use with video disk or any other video storage technique." *Id.* col. 6:20–24.  The replay signal processor 4 is disclosed as being one of "the conventional components of a video recorder/player (commonly known as *VCR*)." *Id.* col. 2:48–53 (emphasis added).  However, the specification also discloses that while the storage medium "is typically a video cassette, *[it] may also be a video disk* or any other suitable storage medium." *Id.* (emphasis added).  Thus, although the term "VCR" refers in common parlance to a video cassette recorder, the patents-in-suit use "VCR" more generically to encompass, for example, a "video disk" player. *See id.*  To reduce the likelihood of confusion, the construction should refer to a "video recorder/player" rather than to a "VCR."  This "video record/player" includes any video recorder/player, either analog or digital, that is capable of video program recording and playback.  Finally, Defendants' proposal of including "conventional" would tend to confuse rather than clarify the corresponding structure and thus should be rejected.

Accordingly, the Court construes "means for receiving from a video storage medium, signals representative of a video program" as follows.  The function is "receiving, from a video storage medium, signals representative of a video program."  The corresponding structure is "replay signal processor 4, which is a component of a video recorder/player, and equivalents thereof."

**"processing means for forming video signals of a form suitable for application to a video display means from said signals"**

The parties agree that this term is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6 and agree on the claimed function, "forming video signals of a form suitable for application to a video display means from said signals."  As to the structure, Guardian proposes

"replay signal processor."   Defendants propose "Replay Signal Processor 4, which is a conventional component of a video recorder player (VCR)."

Guardian agrees with Defendants that "the replay signal processor is the structure that performs the function of forming signals suitable for a video display," but Guardian contends the structure should not be limited to just a VCR.   Doc. No. 583 at 11.   Defendants argue that Guardian's construction is too broad because it would encompass any generic signal processor. Doc. No. 585 at 25.   For the same reasons discussed as to the "means for receiving . . .", above, the corresponding structure includes replay signal processor 4, but should refer to a video recorder/player instead of a "VCR."   Again, the corresponding structure is not limited to a traditional "VCR."   *See* '158 Patent col. 2:48–53.   Instead, the "video record/player" includes any video recorder/player, either analog or digital, that is capable of video program recording and playback.

Accordingly, the Court construes "processing means for forming video signals of a form suitable for application to a video display means from said signals" as follows.   The function is "forming video signals of a form suitable for application to a video display means from said signals."   The corresponding structure is "replay signal processor 4, which is a component of a video recorder/player, and equivalents thereof."

**"video display means"**

The parties dispute whether this term is a means-plus-function limitation.   Guardian argues it is not, and should simply be construed to mean "video display."   In the alternative, Guardian agrees it is a means-plus-function limitation, and agrees with Defendants that the function is "displaying video."   As to the structure, Guardian proposes "a CRT display or television."   Defendants propose "CRT display" for the corresponding structure.

22

Guardian argues that this term is not governed by 35 U.S.C. § 112, ¶ 6 because the term itself provides sufficient structure. Doc. No. 583 at 13. If the Court finds this is a means-plus-function term, Guardian argues that Defendants' proposal to limit the corresponding structure to a "CRT display" is inappropriate, because liquid crystal display ("LCD") televisions "existed at the time of the invention." *Id.* Defendants respond that since the claim fails to disclose any structure for "displaying video," it must be a means-plus-function limitation. Doc. No. 585 at 26. Defendants argue the structure should be limited to a CRT display, because it is the only structure disclosed in the specification. Defendants note other displays are described; however, those displays are for showing data read from the keyboard, not for video display. *Id.* Guardian counters that the specification also discloses a television, therefore the structure should not be limited to just a CRT display. Doc. No. 592 at 4 (citing '158 Patent col. 6:3–7).

"A claim limitation that actually uses the word 'means' will invoke a rebuttable presumption that § 112 ¶ 6 applies." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002) (citations omitted). "[W]here a claim recites a function, but then goes on to elaborate sufficient structure, material or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427-28 (Fed. Cir. 1997). Guardian argues that because "video display means" recites sufficient structure, namely a "video display," and does not recite any function that the "video display means" must perform, the phrase is not a means-plus-function limitation. Doc. No. 583 at 13. Guardian contends this is similar to a prior case where the claim term "analog-to-digital converter means" was not found to be a means-plus-function limitation because the recitation of an "analog-to-digital converter" was sufficient. *Id.* (citing *Digital Technology Licensing, LLC v. Cingular Wireless LLC*, No. 2:06-CV-156, 2007 WL 2300792, at

*8 (E.D. Tex. Aug. 7, 2007)).   There, however, "the specification [was] replete with evidence that an analog-to-digital converter by itself is a sufficient structure to perform the described function."  *Id.*  Here, the video display is not disclosed with any additional detail except for two references to a "CRT display," which presumably refers to a cathode ray tube display.  *See* '158 Patent col. 2:63, col. 3:22.  Additionally, the term "video display means" is not described in the asserted claim. *See Envirco Corp. v. Clestra Cleanroom, Inc.*, 209 F.3d 1360, 1365 (Fed. Cir. 2000) (finding when a term itself imparts structure and its structure is described in the claim, the term is not a means-plus-function limitation).   Therefore, "video display" does not denote sufficient structure to rebut the means-plus-function presumption.

In its alternative proposal, Guardian attempts to also encompass non-CRT television types, such as LCD.   But the disclosures in the specification pertaining to LCDs relate to signaling the user and not to displaying video programs.   '158 Patent col. 3:27.   Guardian presents no authority why the mere existence of LCD televisions at the time of the invention warrants finding that the corresponding structure encompasses LCD televisions.   The only relevant display disclosed in the specification is a "CRT display."  *Id.* col. 2:63, 3:22.

Accordingly, "video display means" is a means-plus-function term.   The function is "displaying video" and the corresponding structure is a "CRT display, and equivalents thereof."

**"means for detecting a code within the signal received by the receiving means"**

The parties agree that this term is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6 and agree on the claimed function, "detecting a code within the signal received by the receiving means."   As to the structure, Guardian proposes "classification detector."[6]

---

[6] At the *Markman* hearing, Guardian agreed that the structure should be "classification detector 5," similar to what Defendants initially proposed. *Markman* Hr'g Tr. 98:11–99:4.

Defendants propose "Classification Detector 5 shown in Figure 1, which is a device that extracts line 16 from the video signal."

Both parties agree that the corresponding structure includes a classification detector. However, they dispute whether the structure must include the particular manner of detecting a code set forth in the specification, i.e., extracting line 16 from the video signal. Guardian contends that it is unnecessary to include a detailed explanation of how the structure would work in a particular embodiment. Doc. No. 583 at 14. Defendants argue that "classification detector" alone does not sufficiently describe any structure, and thus propose further defining the structure, as "a device that that extracts line 16 from the video signal." Doc. No. 585 at 27. Guardian counters that Defendants' construction improperly limits the structure because the classification codes "can be provided in a number of well known ways which ensure that the presence of such codes do not interfere with the normal viewing of video programs.'" Doc. No. 592 at 9-10 (quoting '158 Patent col. 2:57–60; citing *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) ("Even though the term 'detector' does not specifically evoke a particular structure, it does convey to one knowledgeable in the art a variety of structures known as 'detectors.'")).

The specification does disclose that the classification detector extracts line 16 (emphasis added):

> The operation of this embodiment relies on the presence of a program classification code within the video signal. This can be provided in a number of well known ways which ensure that the presence of such codes do not interfere with the normal viewing of video programs. The method used in this embodiment is encoding of a digital word in the form of black and white transitions located on *line 16* of the video signal. This position is chosen so as to be invisible on the CRT display. The technology for this form of signalling [*sic*] is well known, being commonly used for data broadcasting services such as Teletext.

>For the purpose of recording a program and inserting a classification code for later use by the invention, classification code inserter 12 inserts a code, dictated by microcomputer 6, into *line 16* of the video signal as it is recorded.
>
>*Classification detector 5 extracts line 16 from the replay signal*, and presents the code found therein to an input of microcomputer 6.

'158 Patent col. 2:55–3:6.

However, "a court may not import . . . structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (finding that the district court erred by requiring that the corresponding structure for the term "air circulation means" must include the ability to recirculate air). Here, specifying the particular line on which a code is encoded is not essential to performing the claimed function. *See* '158 Patent col. 2:55–3:6; *cf. Acromed Corp. v. Sofamor Danek Grp.,* 253 F.3d 1371, 1382 (Fed. Cir. 2001) (regarding a screw as corresponding structure, finding that "[t]o limit the body portion to a diameter at least as large as the crest diameter of the second externally threaded portion would be to impermissibly import into the claim limitation specific dimensions of a preferred embodiment that are unnecessary to perform the claimed function . . . ."). Therefore, the recited function does not require that any particular line is used for the code.

Accordingly, the Court construes the means-plus-function term "means for detecting a code within the signal received by the receiving means" as follows. The function is "detecting a code within the signal received by the receiving means." The structure is "classification detector 5, and equivalents thereof."

**"means for comparing the detected code to a set of selected codes"**

The parties agree that this term is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6 and agree on the claimed function, "comparing the detected code to a set of selected codes."  As to the structure, Guardian proposes "a microcomputer programmed to perform the 'Read classification,' 'generate array address,' and 'test array bit' steps shown in Figure 2 and/or the 'Read code' and 'Is it REPLACE code' steps shown in Figure 5." Defendants propose "a microcomputer programmed to perform the 'Read classification,' 'generate array address,' and 'test array bit' steps shown in Figure 2 and the 'Read code' and 'Is it REPLACE code' steps shown in Figure 5."

The only dispute between the parties is whether both the algorithms disclosed in Figure 2 and Figure 5 are required.  Guardian contends either structure is sufficient to perform the claimed function, while Defendants submit both are required.  Doc. No. 583 at 15; Doc. No. 585 at 28. Defendants argue that both the steps in Figure 2 and Figure 5 must be included because "the combination of the 'generate array address' and 'test array bit' in Figure 2 provide more detail for the 'Is it REPLACE Code' step" in Figure 5.  Doc. No. 585 at 28.

The corresponding structure of a means-plus-function limitation "must include all structure that actually performs the recited function."  *Mirror Worlds, LLC v. Apple, Inc.*, 742 F. Supp. 2d 875, 882 (E.D. Tex. 2010) (citing *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005)).  Figure 2 generally describes the program executed by the microcomputer to determine whether or not to stop the replay. '158 Patent col. 5:7–9 ( "The selective playing function described above [(including with regard to Figure 2)] is directed to simply terminating replay of a tape which is of a prohibited classification."); *id.* col. 3:37–55. Figure 5 though discloses replacing a program with "substitute material." *Id.* at 5:29-

30. ("A further capability of the invention, directed to providing means for replacing unwanted program with programme from another source, will now be described."). Since Figure 2 and Figure 5 relate to different embodiments, respectively, Guardian's proposal of alternative corresponding structures should be adopted. *See Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258-59 (Fed. Cir. 1999) ("When multiple embodiments in the specification correspond to the claimed function, proper application of § 112 ¶ 6 generally reads the claim element to embrace each of those embodiments . . . ."); *see also Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1346 (Fed. Cir. 2002) ("Proper application of § 112 ¶ 6 generally reads the claim element to embrace distinct and alternative described structures for performing the claimed function.") (citation and quotation marks omitted).

Accordingly, the Court construes the means-plus-function term "means for comparing the detected code to a set of selected codes" as follows. The function is "comparing the detected code to a set of selected codes." The corresponding structure for the term "means for comparing the detected code to a set of selected codes" is "microcomputer 6 programmed to perform the 'Read classification,' 'Generate array address,' and 'Test array bit' steps shown in Figure 2 and/or the 'Read code' and 'Is it REPLACE code' steps shown in Figure 5, and equivalents thereof."

**"controller means for, according to the result of the comparison, sending a signal to an auxiliary device, to cause playing of the video program to be suspended, and responsive to a resumption signal to resume playing of the suspended program when the resumption signal is received"**

The parties agree that this term is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6, however, they dispute the function and the corresponding structure.

28

Guardian proposes the function is "according to the result of the comparison, sending a signal to an auxiliary device, to cause playing of the video program to be suspended." Defendants propose "according to the result of the comparison, sending a signal to an auxiliary device, to cause playing of the video program to be suspended, and responsive to a resumption signal to resume playing of the suspended program when the resumption signal is received." Guardian argues that the additional function proposed by Defendants, "responsive to a resumption signal to resume playing of the suspended program when the resumption signal is received," is a separate limitation and is not in means-plus-function format.  Doc. No. 583 at 16. Defendants counter that the entire claim limitation, including the "responsive" phrase, should be considered a means-plus-function element, because Guardian has failed to rebut the presumption that the entirety of the claim limitation is a means-plus-function limitation.  Doc. No. 585 at 28–29.

While Guardian contends that the "responsive to a resumption signal . . ." language is not part of the means-plus-function limitation, the language is not, for example, set off on a new line. Instead, that language can be read naturally as part of the "controller means" term.  Guardian has not made a compelling argument why the entire claim limitation should not be considered part of the means-plus-function element.  Accordingly, the Court adopts Defendants' proposed function.

If the Court adopted Defendants' proposed function, Guardian proposed the following corresponding structure: "microcomputer programmed to perform the "test array bit" and "Stop transport" steps shown in Figure 2 and/or the 'Input PIN,' 'Does PIN match NV mem,' and 'Start Replay' steps shown in Figure 4 and/or the 'It is REPLACE code,' 'Suspend play,' 'Wait for auxiliary input,' and 'Resume Play' steps shown in Figure 5."   Defendants propose "Microcomputer 6 plus the algorithmic steps shown in Figure 5."

29

The parties agree that the corresponding structure includes microcomputer 6 programmed to perform particular steps, but they dispute what those steps must be. *See WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999).  Guardian argues that in addition to the algorithm set forth in Figure 5, the specification also discloses alternative algorithms, which are depicted in Figure 2 and Figure 4.  Doc. No. 583 at 16–17.  Figure 2 is relevant, because it depicts an algorithm that performs the claimed function when it illustrates the steps taken to test the parental setting of a particular classification code and stopping playback.  *Id.* at 17.  Guardian also argues that the "override" feature illustrated in Figure 4 is tied to the "resumption" function of the controller means.  Defendants counter that "Guardian has provided no evidence that a skilled artisan would understand Figures 2 and 4 to show an algorithm that performs the same function as Figure 5 or that the structure is limited to certain steps of Figures 2 and 4."  Doc. No. 585 at 29.

Figure 4 generally discloses how a user can override the suspension or termination of a program.  '158 Patent col. 2:41–42, 4:32–39.  However, this is not directly related as Guardian suggests to the resumption signal disclosed in the term.  *See Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1376 (Fed. Cir. 2010) (noting that "the written description must clearly link or associate structure to the claimed function").  Instead, sending a signal to an auxiliary device and sending a resumption signal to resume playing of the suspended program are more readily linked to the disclosure associated with Figure 5.  *See* '158 Patent col. 5:38–41.

Additionally, Guardian contends that although Figure 5 depicts the corresponding structure, not all of the steps depicted in Figure 5 are required, "for example the 'Has STOP been pressed' and 'Stop play' steps."  Doc. No. 583 at 17-18.  Defendants counter that these additional

steps are necessary to perform the function and, therefore, they need to be included in the corresponding structure.  Doc. No. 585 at 29.

The corresponding structure that the specification links to the claimed functions is "microcomputer 6," which is a general-purpose processor.  Where the claimed function is disclosed as being performed by a general-purpose processor, the corresponding structure must include the disclosed algorithm.  *WMS Gaming*, 184 F.3d at 1349 ("In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.").  Here, as illustrated in Figure 5, "a signal is sent to auxiliary output 11" in order to "play[] another recording" and "[w]hen the auxiliary device has finished replaying the substitute program, it sends a signal to auxiliary input 12, which is received by microcomputer 6 which causes replay of the first program to resume."  '158 Patent col. 5:26–41.

However, the corresponding structure should not include "structure from the written description beyond that necessary to perform the claimed function."  *Micro Chem.*, 194 F.3d at 1258.  Defendants have failed to demonstrate why the claimed function should be read to encompass the "Has STOP been pressed" and "Stop play" steps shown in Figure 5.  Those steps should therefore be excluded from the corresponding structure.

The Court construes the means-plus-function term "controller means for, according to the result of the comparison, sending a signal to an auxiliary device, to cause playing of the video program to be suspended, and responsive to a resumption signal to resume playing of the suspended program when the resumption signal is received" as follows.  The function is "according to the result of the comparison, sending a signal to an auxiliary device, to cause

playing of the video program to be suspended, and responsive to a resumption signal to resume playing of the suspended program when the resumption signal is received." The corresponding structure is "microcomputer 6 programmed to perform the algorithmic steps shown in Figure 5, except for the "Has STOP been pressed" and "Stop play" steps, and equivalents thereof."

**"inputting means for inputting, from the user, a security code number"**

The parties agree that this term is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6 and agree on the claimed function, "inputting, from the user, a security code number." As to the structure, Guardian proposes "keyboard; press-button key array; special keys; channel select keys; or other keys." Defendants propose "Keyboard 7."

The primary dispute between the parties is whether the specification discloses additional keys that can be used to input a security code. Guardian argues that the specification does disclose other structures besides the keyboard that can be used to input the security code. Doc. No. 583 at 18; Doc. No. 585 at 30. Defendants counter that some of these keys, such as the press button key array and channel select keys, are already part of the keyboard, therefore they do not need to be listed separately. Doc. No. 585 at 30. Additionally, Defendants argue that the other keys, such as the "special keys," are not used to enter a pin number. *Markman* Hr'g Tr. 114:23–115:15. Guardian counters that listing only "Keyboard 7" as the corresponding structure may improperly limit the term, because most people think the word "keyboard" only encompasses a standard QWERTY keyboard. *Id.* at 115:17–116:10.

Regarding keys, the specification discloses that Keyboard 7 includes channel selection keys that serve a double purpose of inputting a security code and selecting channels. '158 Patent

col. 3:15–26. [7]   While the keyboard also includes "special keys," such as "SET CLASSIFICATION" key and "OVERRRIDE" key, only channel selection keys are disclosed as performing the claimed function.

Accordingly, the Court construes the means-plus-function term "inputting means for inputting, from the user, a security code number" as follows.  The function is "inputting, from the user, a security code number."   The corresponding structure is "keyboard 7, including channel selection keys that serve the double purpose of allowing the user to enter a security code number, and equivalents thereof."

**"means for receiving and playing substitute program material from the auxiliary device until the resumption signal is received"**

Both sides agree that this term is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6 and agree on the claimed function, "receiving and playing substitute program material from the auxiliary device until the resumption signal is received."   However, while Guardian proposes the corresponding structure is "microcomputer, with auxiliary input and auxiliary output, programmed to perform the 'Input PIN', 'Does PIN match NV mem?', and 'Start Replay' steps shown in Fig. 4 or the 'Is it Replace Code,' 'Send Auxiliary Output,' 'Wait for Auxiliary Input,' and 'Resume Play' steps shown in Fig. 5," Defendants allege no corresponding structure is disclosed.   Therefore, Defendants argue that claim 21 of the '158 Patent, which contains this limitation, is indefinite under § 112 ¶ 2.  Doc. No. 586 at 1.

---

[7] "Keyboard 7 is a press-button key array, which contains keys for control of all the usual VCR functions, as well as special keys used by this invention.  The special keys include a SET CLASSIFICATION key, used for entering the classifications of undesired material, and an OVERRIDE key, used to disable the selective playing function and play a recording irrespective of classification.  The channel selection keys commonly found on VCRs are used in this embodiment to serve the double purpose of allowing the user to enter a PIN (personal identity number).  Similarly, the other keys of the VCR can serve double functions if desired."

Specifically, Defendants contend that "the specification only discloses that an auxiliary device is responsible for playing the substitute material when a "REPLACE" classification code is read by the microcomputer."  Doc. No. 586 at 3.  But Defendants argue that the specification does not disclose any part of the microcomputer which receives and displays the substitute material from the auxiliary device.  Rather, Defendants argue, the microcomputer only reads classification codes and suspends/resumes the main program when needed.  *Id.* at 3–4. Defendants submit that Figures 4 and 5 also do not disclose the corresponding structure. Defendants argue Figure 4 is irrelevant, because it discusses the "override routine", which is not related to agreed upon function.  *Id.* at 5.  While Figure 5 illustrates the software used to control the auxiliary devices, Defendants argue that Figure 5 does not disclose a structure for receiving and playing the substitute program material.  *Id.* (citing '158 Patent col. 2:44–45).  Defendants conclude that because there is no structure disclosed which performs the agreed function, claim 21 is indefinite.

Guardian counters that the claim is definite, because the specification "discloses an auxiliary device that can receive and play substitute program material, as well as a microprocessor programmed to perform two alternative algorithms for receiving and playing from the auxiliary device until a resumption signal is received."  Doc. No. 591 at 1.  Guardian argues that because the disputed term has control functions rather than actual receiving and playing functions, and because the specification discloses that the auxiliary device performs those functions, there is no requirement that the means at issue must be separate from the auxiliary device.  *Id.* at 4–5.

The "standard [for finding indefiniteness] is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim

34

based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008). "A patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1366 (Fed. Cir. 2010). However, if the specification fails to disclose structure corresponding to a means-plus-function limitation, the claim will be found invalid as indefinite. *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007); *see Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012) (confirming invalidity because "[t]he specification merely provides functional language and does not contain any step-by-step process for controlling the adjusting means").

As a threshold matter, Figure 4 and the accompanying description relate to an "override" function and are not relevant to the agreed function. Therefore, Guardian's proposal of steps from Figure 4 as corresponding structure is therefore expressly rejected.

Turning to Figure 1, the "auxiliary input 12" is shown with an arrow pointing into the microcomputer 6. '158 Patent, Fig. 1. Yet, the only path between the microcomputer 6 and the replay signal output 10 is through the transport controller 9 and storage medium 3, which a person of ordinary skill in the art would not see as a plausible pathway for playing substitute program material. *Id.* Although microcomputer 6 is also shown connected to "display 8" in Figure 1, the display 8 is used to signal the user, not for displaying video programs. *Id.* col. 3:27.

The auxiliary device is further illustrated in Figure 5 and its accompanying description. The specification discloses that the auxiliary device plays the substitute program material and that "an auxiliary switching device selects the substitute material to be displayed instead of the signal from replay signal output 10." *Id.* col. 5:26–31. The "auxiliary device can be a VCR."

*Id.* col. 5:49.  Because the auxiliary device in the disclosed embodiment is a "VCR," and because the phrase "auxiliary device" does not, by itself, connote any particular structure, the corresponding structure for the disputed means-plus-function term should include a "VCR."  *Id.* col. 5:26–31.  The specification uses "VCR" to refer to a "video recorder/player," which can encompass a video disk player rather than merely a cassette player.  *See id.* col. 2:48–54. Further, because the agreed-upon function requires "substitute program material," the video recorder/player must be configured to play substitute program material.

Finally, control of the auxiliary device and the auxiliary switching device requires microcomputer 6 to be programmed to perform the "Send Auxiliary Output" step shown in Fig. 5.  The other steps shown in Fig. 5, which relate to playing the main program rather than the substitute program material, are not necessary for receiving and playing substitute program material from the auxiliary device.   Since the specification clearly discloses a corresponding structure that performs the agreed function, claim 21 of the '158 Patent is not indefinite.

Accordingly, the Court construes "means for receiving and playing substitute program material from the auxiliary device until the resumption signal is received" as follows.  The function is "receiving and playing substitute program material from the auxiliary device until the resumption signal is received."  The corresponding structure is "an auxiliary switching device, a video recorder/player configured to play substitute program material, and microcomputer 6 programmed to perform the 'Send Auxiliary Output' step shown in Figure 5, and equivalents thereof."

## CONSTRUCTION OF DISPUTED TERMS — U.S. PATENT NO. 4,930,160

**"local to"**

Guardian proposes "in close proximity to."  Defendants propose "in close proximity to, but not within."

The primary dispute between the parties is whether the term includes "within."  Guardian submits that Defendants' proposal to "exclude instances in which the alternative source of video is within the receiving station" should be rejected because "[t]he ordinary meaning of 'local' does not exclude things that are 'within.'"  Doc. No. 583 at 21.  Guardian also argues that Defendants' construction would "read out an embodiment of the specification when there is no reason to believe that this embodiment was meant to be excluded."  *Id.* at 22.  Finally, Guardian argues that the reexamination prosecution history did not limit the term.  *Id.* at 23.  Even though the Examiner "f[ound] that there was no support in the patent to limit the construction of 'local' to within the television," "at no time did the Examiner state that 'local' did not include "within the television set itself" or within the receiving station more generally."  *Id.* at 23 (citing Ex. 11, 12/4/2008 Notice of Intent to Issue Ex Parte Reexamination Certificate at 10-11).

Defendants respond that during the reexamination, Guardian attempted to include claims directed to the alternative source of video signal which were within a television.  Doc. No. 585 at 3-4.  Defendants submit that the PTO rejected Guardian's interpretation as lacking support in the specification.  *Id.* at 4.  Defendants note that Guardian then withdrew what Defendants call the "within" amendments.  *Id.*  Defendants conclude that "[t]he record in reexamination — amendment, rejection of amendment, cancellation of claims, argument, rejection of argument — could not be more clear in establishing that 'local to' cannot be construed to cover the generation of an alternative signal within the television or other receiving station."  *Id.* at 5.  Defendants

further urge that "nowhere does the specification describe a system in which the receiving station includes the alternative source."  *Id.*   Finally, Defendants note that in *Toshiba*, a post-reexamination case, the Central District of California adopted the construction that Defendants here propose, and the court entered summary judgment for the defendant.  *Id.* at 6; *Guardian Techs., Ltd. v. Toshiba Am. Consumer Prods., LLC*, No. 2:09-CV-52, Doc. No. 48 (C.D. Cal. Aug. 21, 2009) (Real, J.).

Guardian replies that the prior construction should not be adopted and highlights that the *Toshiba* claim construction decision was later vacated.  Doc. No. 592 at 1; No. 2:09-CV-52, Doc. No. 65 (C.D. Cal. Oct. 27, 2010).   Guardian also argues that the reexamination prosecution history relied upon by Defendants involved its effort to narrow the claims by adding a "within" requirement.  *Id.* at 2.   Guardian submits: "[t]hat [it] was not entitled to a claim reciting a limitation specifically requiring 'within' does not mean that [it] was not entitled to a broader claim covering 'local to,' which can be infringed by something 'within.'" *Id.* at 3.

In the prior *Toshiba* case, the Central District of California construed "local to" to mean "in close proximity to, but not within."  *Toshiba*, Doc. No. 48 at 8.  Specifically, the *Toshiba* court found that "[t]he ordinary meaning of 'local to' is readily apparent to a layperson.  Disneyland is located local to Los Angeles but within Anaheim.  'Local to' does not include 'within.'" *Id.*  Furthermore, the parties had agreed that the Examiner was one of ordinary skill in the art, but "neither party presented any other evidence of the ordinary meaning of the limitation "local to" by one of ordinary skill in the art." *Id.*  Therefore, the *Toshiba* court agreed with the Examiner's interpretation and construed the term to mean 'in close proximity to, but not within' a television set." *Id.*  However, the *Toshiba* court later vacated its claim construction upon joint motion of the parties.  *See* No. 2:09-CV-52, Doc. No. 65 (C.D. Cal. Oct. 27, 2010).

As previously stated, when a patent has been previously construed, this Court considers the prior construction and current parties' arguments.   During reexamination, Guardian attempted to amend the claims.   However, the '160 Patent expired during reexamination, and because a reexamination certificate cannot issue with amended claims after a patent expires, the patentee cancelled all amendments.   Doc. No. 585, Ex. F, 9/25/2008 Amendment at 4.   Guardian then attempted to construe "local to" to mean within a television, but the PTO rejected Guardian's interpretation.   *See id.* at 6, 7, 18.   Specifically, the Examiner found the specification discloses that "the alternative material selected during censorship periods can originate from a remote source, for example another television broadcast, or locally, for example from a video disk or tape player.   The local source may also be simply a black signal generator." Doc. No. 585, Ex. G, 12/4/2008 Notice of Intent to Issue Ex Parte Reexamination Certificate at 11 (emphasis omitted) (quoting '160 Patent col. 6:39–43).   However, the specification "does not disclose the exact location of the black signal generator other than the fact that it is local." *Id.* at 10.   While the Examiner "admit[ted] . . . he had erroneously included the signal generator to be 'within the television set' itself," the Examiner found that the specification actually does not support such an interpretation.   *Id.* at 11.   Therefore, the Examiner concluded that the language should not be construed as "within the television set itself." *Id.*   The Examiner noted that Guardian itself admitted "that if the rejection is withdrawn this claim interpretation is unwarranted and unnecessary." *Id.*   Therefore, the Examiner found that "the alternative material selected during censorship periods can originate from a remote source, for example another television broadcast, or locally, for example from a video disk or tape player.   The local source may also be simply a black signal generator." '160 Patent col. 6:39–43

While the term was discussed during the reexamination, the reexamination prosecution history contains no "definitive statements" by the patentee that the term "local to" must *exclude* something being "within." *Omega Eng. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). Instead, the PTO merely rejected Guardian's proposal that "local to" must *require* something being "within." Guardian's inability to narrow the claims does not mean that the proposed narrowing interpretation, which was rejected by the PTO, should now be carved out of the claims that the PTO confirmed.

Finally, although the *Toshiba* court adopted the present Defendants' proposed construction, the court later vacated that construction as well as its grant of summary judgment. *See* No. 2:09-CV-52, Doc. No. 48 at 8 (C.D. Cal. Aug. 21, 2009); *id.*, Doc. No. 65 (C.D. Cal. Oct. 27, 2010). On balance, whatever persuasive weight the *Toshiba* construction might be afforded is outweighed by the broad language of the claims and the absence of any definitive limiting statements by the patentee. Defendants' proposal of "but not within" is therefore expressly rejected.

Accordingly, the Court construes "local to" to mean "in close proximity to."

**"alternative source of video signal"**

Guardian proposes "different origin of the video signal." Defendants propose "a device that generates a video signal that is different from the device that generated the censored video program."

Both parties agree that the alternative source of video signal is a different signal, however, they dispute whether the alternative source of video is generated from a separate device. Defendants' proposal is premised on the Court adopting their proposal for "local to."

However, the Court has rejected Defendants' proposal, as discussed above.  For the same reasons discussed as to the term "local to," Defendants' proposed construction is expressly rejected.

Accordingly, the Court therefore construes "alternative source of video signal" to mean "different origin of the video signal."

 **"causing/cause an alternative source of video signal to be selected for display"**

Guardian proposes "causing/cause a different origin of video signal to be selected for display."  Defendants propose "[causing / cause] only a device that generates a video signal that is different from the device that generated the censored video program to be selected for display."

 Guardian argues that there is nothing in the intrinsic record which requires a different, separate device to generate the alternative video signal, therefore Defendants' proposal should be rejected.  Doc. No. 583 at 24-25.  Defendants counter that selecting an alternative source of video signal "necessarily means the censored video signal is *not selected* for display," thus there must be a separate device to generate the alternative signal.  Doc. No. 585 at 7–8.  Defendants submit, for example, that "[a]s pictured in Figures 1 and 5, relay 7 is a switch that transmits received input or alternative input, but not both."  *Id.* at 8.  Defendants also contend that during the reexamination, Guardian represented that there must be a separate source for the alternative video signal.  *Id.* at 8.  Lastly, Defendants argue Guardian's proposal should be rejected because it fails to clearly define the term.  *Id.*  Guardian counters that during reexamination, Guardian "was explicit that although the source must be separate and distinct, it could be within the same device."  Doc. No. 592 at 4 (citing Ex. 2, 7/28/2006 Response to Office Actions at 8 (noting that the invention "allows television manufacturers to determine for themselves what the alternate

signals can or will be")).   Therefore, Guardian argues, it never limited the term to separate devices.

Essentially, Defendants rehash their arguments regarding "local to," which the Court has rejected, as discussed above.  The specification does not require the alternative source to be from a separate and distinct source.  *See* '160 Patent col. 3:50–57.

Accordingly, the Court construes "causing/cause an alternative source of video signal to be selected for display" to mean "causing/cause a different origin of video signal to be selected for display."

**"video display means"**

As discussed above in the context of the '158 Patent, the parties dispute whether this term is a means-plus-function limitation.  Guardian argues it is not, and should simply be construed to mean "video display."  To support its position, Guardian asserts the same arguments it used for "video display means" as used in the '158 Patent.  For the same reasons previously discussed, "video display means" is a means-plus-function limitation.  *Supra* at 22–23.

If the Court finds the term is a means-plus-function limitation, Guardian agrees with Defendants about the function, however, proposes the corresponding structure is "television or monitor."  Defendants propose that the corresponding structure is "CRT display, CRT driver 10, and CRT 13 of Figure 1."  Defendants argue the structure should be limited to a "CRT display, CRT driver 10, and CRT 13 of Figure 1," because these are the structures disclosed in the specification.  Doc. No. 585 at 9-10; *Markman* Hr'g Tr. 44:19–45:2.  Guardian counters that this construction excludes other structures disclosed in the specification, such as a monitor, therefore, it proposes a broader construction.  Doc. No. 583 at 25 (citing '160 Patent col. 3:6–14).

For the same reasons discussed for the term "video display means" in the '158 Patent, above, the Court construes "video display means" as follows.  The function is "displaying video."  The corresponding structure is "CRT display, and equivalents thereof."

**means for displaying**

The parties agree that this term is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6, and agree that the function is "displaying the selected video signal."  As to the structure, Guardian proposes "television or monitor."  Defendants propose "CRT display and CRT 13 of Figure 1."

Guardian raises the same arguments regarding the structure as it did for the previous term, "video display means."  Therefore, for the same reasons discussed for the term "video display means," above, the Court construes "means for displaying" as follows.  The function is "displaying the selected video signal."  The corresponding structure is a "CRT display, and equivalents thereof."

**"selector means equipped to cause a received video signal to be selected for display if the result of said comparison indicates that the received program is to be displayed and to cause an alternative source of video signal to be selected for display if the result of said comparison indicates that an alternative video signal is to be displayed"**

The parties agree that this term is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6 and agree on the claimed function, "cause a received video signal to be selected for display if the result of said comparison indicates that the received program is to be displayed and to cause an alternative source of video signal to be selected for display if the result of said comparison indicates that an alternative video signal is to be displayed."  As for the structure, Guardian proposes "microcomputer programmed to perform the 'Test Array Bit,' 'Energize relay,' and 'Release relay' steps shown in Figure 2."  Defendants propose "Relay 7, the switch

shown immediately above relay 7 in Figure 1, microcomputer 6, plus the algorithmic steps shown in Figure 2."

At the *Markman* hearing, Guardian agreed that "Relay 7" should be included in the corresponding structure. *Markman* Hr'g Tr. 50:6–52:10. Additionally, the parties agreed that the "the switch shown immediately above relay 7 in Figure 1," as proposed by Defendants, is part of Relay 7, therefore it is no longer necessary to list the switch as a separate part of the corresponding structure. *Id*. However, the parties continue to dispute which of the algorithmic steps shown in Figure 2 are necessary for carrying out the claimed function. Defendants urge because the specification discloses that Figure 2 depicts an operation loop that is executed repeatedly at high speed, all of the steps shown in Figure 2 are necessary for the relay to be energized and released. *See* '160 Patent col. 4:59–62. Guardian disagrees, and argues instead that many of the steps shown in Figure 2 are unnecessary for performing the claimed function. Doc. No. 583 at 27; *Markman* Hr'g Tr. 52:11–53:21. For example, the override feature is depicted in Figure 2, however, this feature is not part of the disputed function. *Markman* Hr'g Tr. 53:17–19.

Figure 2 depicts an operational loop executed by the microcomputer, which begins when a key is pressed. '160 Patent col. 3:33–35. The program begins "by scanning the keyboard to test for a key depression." *Id.* col. 4:43-44. If there is no button pressed, the program continues, reading the next classification code in the video. An address is then generated as a function of the code, which the microcomputer compares to an internal table to determine the classification status, either ENABLED or DISABLED. *Id.* col. 4:45–51. "A set bit indicates DISABLED, while a clear bit indicates ENABLED." *Id.* col. 4:52–54. If the microcomputer determines the "bit is set, relay 7 is energized, causing the video and audio signals to be switched to the alternate

sources.  If the bit is clear, relay 7 is released, with the opposite effect." *Id.* col. 4:56–60.  The

rest of the figure depicts what happens when a key is pressed, i.e. when a user wishes to set a

classification code or override the classification code.  *Id.* col. 4:64–col. 5:50.

Guardian is correct – part of Figure 2 does not involve the agreed function of the term.

The steps involving setting or override classification codes do not involve performing the

claimed function.  However, Guardian also includes additional steps not necessary to perform the

claimed function.  Guardian proposes that "Test Array Bit" is part of the "selector means," but

that function is instead encompassed by the preceding limitation in Claim 14, "means for

accessing said memory and *comparing* the contents thereof with received codes."  Indeed, the

parties have agreed that the corresponding structure for the "means for accessing . . . and

comparing . . ." is "microcomputer programmed to perform the 'Read Classification,' 'Generate

array address,' and *'test array bit'* steps shown in Figure 2."  Doc. No. 568 at 5.  Thus, for

"selector means" the microcomputer need only be programmed to perform the "Energise [*sic*]

Relay" and "Release Relay" steps shown in Figure 2.

Accordingly, the Court construes the means-plus-function term "selector means equipped

to cause a received video signal to be selected for display if the result of said comparison

indicates that the received program is to be displayed and to cause an alternative source of video

signal to be selected for display if the result of said comparison indicates that an alternative video

signal is to be displayed" as follows.  The function is "cause a received video signal to be

selected for display if the result of said comparison indicates that the received program is to be

displayed and to cause an alternative source of video signal to be selected for display if the result

of said comparison indicates that an alternative video signal is to be displayed."  The structure is

"(1) relay 7, and equivalents thereof; and (2) microcomputer 6 programmed to perform the 'Energise relay' and 'Release relay' steps shown in Figure 2, and equivalents thereof."

**"means for inputting from the user a personal identity number"**

The parties agree that this term is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6 and agree on the claimed function, "inputting from the user a personal identity number." As for the structure, Guardian proposes "keyboard; remote control; press-button key array; special keys; channel select keys; or other keys."[8] Defendants propose "Keyboard 8; remote controller."

Guardian argues that the specification discloses other structures that can input the security code besides a keyboard, thus it would be improper to limit the structure to just "Keyboard 8; remote controller." Doc. No. 583 at 28. Defendants contend that the other types of keys cited by Guardian are not disclosed as being used for inputting a personal identity number. Doc. No. 585 at 12. Rather, Defendants argue that their proposed structure is the only structure disclosed in the specification. *Id.*

The specification discloses that keyboard 8 "is a press-button key array, which contains keys for control of all the usual television functions, as well as special keys used by this invention." '160 Patent col. 4:21–24. The "usual channel selection keys of the receiver of this embodiment serve the double purpose of allowing the user to enter a PIN (personal identity number). Similarly, the other keys can serve double functions if desired." '160 Patent col. 4:28–33, 6:31–35. Much like for the term "inputting means for inputting, from the user, a security

---

[8] In the parties' pre-briefing claim charts, Guardian proposed as the corresponding structure: "keyboard; remote control; press-button key array; special keys; channel select keys; or other keys; *and/or microcomputer programmed to perform the 'Request PIN' and 'Input PIN from keyboard' steps shown in Figure 3*." Doc. No. 568, Ex. 1 at 31 (emphasis added).

code number" discussed above, the specification discloses that keyboard 8 includes channel selection keys that serve a double purpose.  *See id.*

Accordingly, the Court construes "means for inputting from the user a personal identity number" as follows.  The function is "inputting from the user a personal identity number."  The corresponding structure is "keyboard 8, including channel selection keys that serve the double purpose of allowing the user to enter a personal identity number, and equivalents thereof."

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above.  Further, because Defendants have failed to demonstrate a lack of corresponding structure in the specification, Defendants' Amended Motion for Partial Summary Judgment of Invalidity of Claim 21 of U.S. Patent No. 4,930,158 is **DENIED.** (Doc. No. 586).

 For ease of reference, the Court's claim interpretations are set forth in a table in Appendix A.

**So ORDERED and SIGNED this 2nd day of May, 2013.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

47

**APPENDIX A**

| Claim Term | Court's Construction |
|---|---|
| auxiliary device | source of substitute program material |
| set of selected codes | one or more user selected codes |
| detecting a code within the signal | detecting a code embedded in the signal |
| playing/replay | processing of the video program to produce video signals of a form suitable for display |
| suspended/to be suspended | active playback is paused or temporarily stopped until a predetermined time period or type of action |
| substitute program material | video material that replaces a portion of a video program |
| video program | recorded video programs, broadcast television programs, and cable television, regardless of the media on which they are recorded |
| means for receiving from a video storage medium, signals representative of a video program | Function: receiving, from a video storage medium, signals representative of a video program<br><br>Structure: replay signal processor 4, which is a component of a video recorder/player, and equivalents thereof" |
| processing means for forming video signals of a form suitable for application to a video display means from said signals | Function: forming video signals of a form suitable for application to a video display means from said signals<br><br>Structure: replay signal processor 4, which is a component of a video recorder/player, and equivalents thereof |
| video display means | Function: displaying video<br><br>Structure: CRT display, and equivalents thereof |
| means for detecting a code within the signal received by the receiving means | Function: detecting a code within the signal received by the receiving means<br><br>Structure: classification detector 5, and equivalents thereof |

| | |
|---|---|
| means for comparing the detected code to a set of selected codes | Function: comparing the detected code to a set of selected codes<br><br>Structure: microcomputer 6 programmed to perform the 'Read classification,' 'Generate array address,' and 'Test array bit' steps shown in Figure 2 and/or the 'Read code' and 'Is it REPLACE code' steps shown in Figure 5, and equivalents thereof |
| controller means for, according to the result of the comparison, sending a signal to an auxiliary device, to cause playing of the video program to be suspended, and responsive to a resumption signal to resume playing of the suspended program when the resumption signal is received | Function: according to the result of the comparison, sending a signal to an auxiliary device, to cause playing of the video program to be suspended, and responsive to a resumption signal to resume playing of the suspended program when the resumption signal is received<br><br>Structure: microcomputer 6 programmed to perform the algorithmic steps shown in Figure 5, except for the "Has STOP been pressed" and "Stop play" steps, and equivalents thereof |
| inputting means for inputting, from the user, a security code number | Function: inputting, from the user, a security code number<br><br>Structure: keyboard 7, including channel selection keys that serve the double purpose of allowing the user to enter a security code number, and equivalents thereof |
| means for receiving and playing substitute program material from the auxiliary device until the resumption signal is received | Function: receiving and playing substitute program material from the auxiliary device until the resumption signal is received<br><br>Structure: an auxiliary switching device, a video recorder/player configured to play substitute program material, and microcomputer 6 programmed to perform the 'Send Auxiliary Output' step shown in Figure 5, and equivalents thereof |
| local to | in close proximity to |
| alternative source of video signal | different origin of the video signal |
| causing/cause an alternative source of video signal to be selected for display | causing/cause a different origin of video signal to be selected for display |

| | |
|---|---|
| video display means | Function: displaying video<br><br>Structure: CRT display, and equivalents, thereof |
| means for displaying | Function: displaying the selected video signal<br><br>Structure: CRT display, and equivalents thereof |
| selector means equipped to cause a received video signal to be selected for display if the result of said comparison indicates that the received program is to be displayed and to cause an alternative source of video signal to be selected for display if the result of said comparison indicates that an alternative video signal is to be displayed | Function: cause a received video signal to be selected for display if the result of said comparison indicates that the received program is to be displayed and to cause an alternative source of video signal to be selected for display if the result of said comparison indicates that an alternative video signal is to be displayed<br><br>Structure: (1) relay 7, and equivalents thereof; and (2) microcomputer 6 programmed to perform the 'Energise relay' and 'Release relay' steps shown in Figure 2, and equivalents thereof |
| means for inputting from the user a personal identity number | Function: inputting from the user a personal identity number<br><br>Structure: keyboard 8, including channel selection keys that serve the double purpose of allowing the user to enter a personal identity number, and equivalents thereof |